# Attachment A

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

HFA SERVICES LLC, a
Florida limited liability company
d/b/a CALL 48,

     Plaint

v.                       Case No.  50-2022-CA-01570XXXXMB

EXIANT COMMUNICATIONS, LLC,
a Florida limited liability company,

     Defendants.

_____/

**SUMMONS**

**THE STATE OF FLORIDA**
**To Each Sheriff of the State:**

     YOU ARE COMMANDED to serve this Summons and a copy of the complaint in this action on the defendant:

Exiant Communications, LLC
6208 Longleaf Pine Road
Eldersburg, Maryland 21784

IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail, e-mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

DATED on  **Mar 07 2022** .

**JOSEPH ABRUZZO**
Clerk of Circuit Court

By
Deputy Clerk  **JOSIE LUCCE**

Plaintiff's Attorney:
Daniel B. Rosenthal, Esq.
DBR Law, P.A.
1900 Glades Road, Suite 270
Boca Raton, FL 33431
561.853.0991 Telephone
E-mail: daniel@dbrlawfirm.com

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the ADA Coordinator, Hillsborough County Courthouse, 800 E. Twiggs St., Room 604, Tampa, Florida 33602, (813) 272-7040, at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.**

### IMPORTANTE

Usted ha sido demandado legalmente. Tiene 20 dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.
Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

### IMPORTANT

Des poursuites judiciares ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

IN RE: STANDING ORDER FOR
CASE MANAGEMENT FOR SUBMISSION
OF AGREED CASE MANAGEMENT PLAN FOR
CASES FILED ON OR AFTER APRIL 30, 2021

_____/

### STANDING ORDER FOR CASE MANAGEMENT AND SUBMISSION OF AGREED CASE MANAGEMENT PLAN IN CIVIL CASES IN THE FIFTEENTH JUDICIAL CIRCUIT FILED ON OR AFTER APRIL 30, 2021 (DCMSO)

Pursuant to Florida Rule of Civil Procedure 1.200(a), Florida Rule of General Practice and Judicial Administration 2.545, and Administrative Order 3.107 entered by the Chief Judge of this Circuit, the parties are informed of the following information and procedures applicable to civil lawsuits filed in the Circuit Court on or after April 30, 2021:

1. **SERVICE OF THIS ORDER.** The Plaintiff is directed to serve a copy of this Order with each Summons issued in this case. One copy of this Order is to be filed with the Clerk of the Circuit Court with proof of service.

2. **CIVIL CASE MANAGEMENT SYSTEM.** The Supreme Court of Florida has established guidelines for the prompt processing and resolution of civil cases. This Court has adopted a case management system to help meet those guidelines. In contested cases, the parties are required to participate in the case management system. The case management system requires early consultation and cooperation among the parties for the preparation and submission of an Agreed Case Management Plan and early involvement by the Court. The Agreed Case Management Plan requires the parties to identify a case track, confer in good faith and attempt to narrow the matters in controversy, identify the issues that require direct involvement by the Court, and establish a schedule for addressing those issues.[1] The Agreed Case Management Plan may be accessed at the Court's website at: https://15thcircuit.com/civil-differentiated-forms-and-orders.

Unless all of the Defendants have been served and have been defaulted or dropped, an Agreed Case Management Plan must be submitted to the assigned divisional queue via the Court's online scheduling system (OLS) as an attachment, in PDF format, to a proposed Order Accepting Agreed Case Management Plan on or before 130 days from the date of filing of the initial complaint. If the parties are unable to agree on an Agreed Case Management Plan by the applicable deadline, a

---

[1] Case Track options include Expedited, Streamlined, General, or Complex. Case Tracks have been established in order to comply with the case disposition standards set forth in Florida Rule of General Practice and Judicial Administration 2.250(a)(1)(B).

case management conference will be scheduled by the Court or the Court will review and issue an Order Implementing Case Management Plan without agreement of the Parties. No matters that arise as a result of this standing order, including lack of agreement, will be set on the Court's Uniform Motion Calendar and will, instead, be settled by the Court either at the case management conference or via an Order Implementing Case Management Plan without agreement of the parties. If a case management conference is scheduled, attendance by trial counsel and those parties who are not represented by counsel is mandatory.

If all Defendants are served and defaulted or dropped, the Plaintiff will file the appropriate documentation to pursue a Default Final Judgment within 130 days of the filing of the complaint and Final Judgment is to be entered or set for hearing within 150 days of the filing of the complaint.

3. **MEDIATION/ALTERNATIVE DISPUTE RESOLUTION (ADR)**. ADR provides parties with an out-of-court alternative to settling disagreements. Mediation is a type of ADR wherein an independent third party attempts to arrange a settlement at a conference between the parties. The Court requires the parties to participate in Mediation prior to trial unless the parties agree to another form of ADR.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, on this 26 day of April, 2021.

15TH JUDICIAL CIRCUIT
ADMINISTRATIVE OFFICE OF THE COURT

**Administrative Circuit Judge**

Filing # 144063506 E-Filed 02/16/2022 04:12:39 PM

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

HFA SERVICES LLC, a
Florida limited liability company
d/b/a CALL 48,

        Plaintiff,

v.

EXIANT COMMUNICATIONS, LLC,
a Florida limited liability company,

        Defendants.

_____/

Case No. 50-2022-CA-001570XXXXMB
Division AD

## COMPLAINT

Plaintiff HFA Services LLC d/b/a Call 48 ("HFA Services"), hereby sues Defendant Exiant

Communications, LLC ("Exiant"), and states as follows:

## NATURE OF THE ACTION

1.     This is an action to right the wrongs perpetrated by Exiant, which, through a series

of misrepresentations and through outright coercion, has attempted to re-trade the agreement with

HFA Services that it entered in 2020, damaging HFA Services.

## PARTIES, JURISDICTION AND VENUE

2.     HFA Services is a Florida limited liability company with a principal place of

business at 7700 Congress Avenue, Suite 3214, Boca Raton, Florida 33487. Its affiliates include

HFA Holdings LLC ("HFA Holdings") and IP Horizon, LLC ("IPH"; together with HFA Services

and HFA Holdings, the "HFA Companies").

3.     Exiant is a Florida limited liability company with a principal address at 6208

Longleaf Pine Road, Eldersburg, Maryland 21784.

1

4.    The Court has jurisdiction over the subject matter of this controversy based on the claims and relief sought by HFA Services.

5.    Venue is proper in Palm Beach County, Florida because the underlying agreement was entered into in Palm Beach County, Florida and the Defendant's actions damaged HFA Services in Palm Beach County, Florida and, therefore, this action accrued in Palm Beach County, Florida.

<u>**GENERAL ALLEGATIONS**</u>

6.    HFA Services is in the communications industry.

7.    Blitz Telecom Consulting, LLC ("BTC") is an affiliate of Exiant.

8.    Upon information and belief, at all relevant times, BTC has shared common ownership with Exiant.

9.    At all relevant times, BTC was in the communications industry.

10.    HFA Holdings and BTC entered into a May 29, 2020 Asset Purchase Agreement. (the "APA").

11.    Pursuant to the APA, HFA Holdings purchased all of BTC's right, title and interest to certain assets, including BTC's proprietary "Omnivision" software, equipment, specific customer contracts, customer lists, customer deposits, customer billing account information and goodwill associated with the purchased business, all as detailed in the APA.

12.    Pursuant to the terms of the APA, the parties agreed that as a condition to that deal and as part of a series of integrated transactions (together, the "Transactions"), at closing the parties or their affiliates, would enter into certain other agreements (together referred to as the "Closing Agreements").

2

A. **The Exiant-HFA Services Master Services Agreement.**

13.     One of the Closing Agreements that was central to the Transactions was an Exiant NLA Master Services Agreement between Exiant, as vendor, and HFA Services and its affiliates (the "Exiant-HFA MSA"), as customer.  HFA Services and HFA Holdings are affiliates.  A copy of the Exiant-HFA MSA is annexed hereto as **Exhibit A**.

14.     Exiant either owned or controlled telephone numbers for each of the BTC customers whose contracts were purchased by HFA Holdings from BTC under the APA.

15.     Pursuant to the Exiant-HFA MSA, Exiant agreed to provide certain Nationwide Local Access Services which are stated in detail on Attachment A to the Exiant-HFA MSA. (**Exhibit A** at ¶ 1.2 and Attachment A).

16.     Among the services that Exiant agreed to provide under the Exiant-HFA MSA was the transfer, or "porting," of telephone numbers that Exiant owned or controlled for each of the contracts purchased by HFA Holdings from BTC under the APA (at HFA Holdings's request and direction) to a third party provider in accordance with Exiant's standard operating policies and practices.  (**Exhibit A** at Attachment A ¶ a.2.2).

17.     The parties' intent was to port the customer telephone numbers from Exiant to an HFA Holdings affiliate.

18.     The HFA Holdings affiliate that HFA Holdings selected was IPH, which the HFA Companies purchased as part of the Transactions.

19.     By its own terms, the Exiant-HFA MSA incepted on June 1, 2020, and had an initial term of one year.  Thereafter, it would renew automatically for successive six month terms unless terminated by either party upon written notice delivered at least 60 days prior to the end of the term.  (**Exhibit A** at ¶ 2.1).

3

20.     The parties anticipated that the HFA Companies would only need Exiant's services for a year to fully effectuate the transfer, or "porting," of telephone numbers from Exiant to IPH.

21.     The porting services contained in the Exiant-HFA MSA were a critical component of the Transactions, because they permitted the HFA Companies to migrate or "port" the telephone numbers that Exiant owned or controlled for each of the contracts purchased by HFA Holdings from BTC under the APA onto an alternative platform (at IPH).

**B. Exiant Refused To Perform Under The Exiant-HFA MSA Before Expiration of Its Term, And Demanded That the HFA Companies Enter Into A New Agreement At An Exorbitant Price And With More Onerous Terms Or Face A Shut-Off of All Services.**

22.     Beginning in June 2020, Exiant provided services to HFA Services under the Exiant-HFA MSA, including, among other things, porting telephone numbers from Exiant to IPH for customers whose contracts HFA Holdings had purchased from BTC in the APA.

23.     Over the course of the first 10 months following the closing of the Transactions, Exiant ported over two million telephone numbers to IPH through established protocols and with the assistance of a third party vendor, Douglas Osborne ("Osborne").

24.     Towards the end of the contractual term, however, Exiant slowed, and ultimately ceased, its effort to port numbers to IPH as it was contractually bound to do.

25.     Exiant could have completed the porting out of all of the remaining telephone numbers, had Exiant simply followed the same processes and protocols that it had employed over the prior 10 months.

26.     Exiant instead advised Osborne not to cooperate with the transfer of the remaining telephone numbers to IPH.

27.     Specifically, Exiant's Jim Finneran advised Osborne, "I don't want anything moving out of Exiant without my express approval."

4

28.     Exiant deliberately failed to port out to IPH all of the remaining numbers that HFA Services requested Exiant to port out by the end of the contractual term.

29.     Upon information and belief, Exiant's deliberate action in refusing to port out the remaining numbers in a timely way violated Exiant's internal policies.

30.     Exiant deliberately failed to port out all of the remaining numbers by the end of the contractual term because it already had given HFA Services notice of termination through a January 18, 2021 termination letter.  In that letter, Exiant terminated the Exiant-HFA MSA effective at the one-year anniversary of that deal, thereby extinguishing the renewal terms of that contract.

31.     Instead, in the very same letter, Exiant offered to continue the relationship under newly-negotiated terms.

32.     HFA Services did not accept the new terms.

33.     Towards the end of the one-year contractual term of the Exiant-HFA MSA, instead of performing under the Exiant-HFA MSA and porting out the remaining telephone numbers as it could have done (or renewing the Exiant-HFA MSA under its terms), Exiant demanded that HFA Services or one of its affiliates enter a completely new Master Services Agreement under which Exiant could extract additional payment from the HFA Companies (the "Replacement MSA").  A copy of the Replacement MSA is annexed as **Exhibit B**.

34.     The Replacement MSA encompassed the same port-out services as the Exiant-HFA MSA.  However, it incepted June 1, 2021 and had a term of only 90 days.  It also required payment of an additional $163,000, all of which was due to be paid by close of business June 2, 2021, the day after the Replacement MSA incepted.  It was entered into by "HFA Services LLC dba Call 48 and its affiliates."

5

35.     The Replacement MSA also included as a term a "Release and Covenant Not to Sue," under which the HFA Companies represented that they released Exiant and its affiliates and their members, employees, officer, directors and others from any claims that the HFA companies had against them to that time.

36.     The HFA Companies adamantly refused to execute the Replacement MSA on various grounds. For one, Michael Halperin, HFA Services' Chief Executive Officer ("Halperin"), insisted that the Replacement MSA was not necessary because all of the services that were contracted for could have been performed and completed within the initial term of the Exiant-HFA MSA.

37.     Second, Halperin objected to having to pay $163,000 for services that were already subsumed within the Transactions and the Closing Agreements and for which the HFA Companies paid a combined total of $10 million, especially as those services could have and should have been completed within the initial term of the Exiant-HFA MSA.

38.     Third, Halperin objected to entering into another agreement with further, different and additional terms to the Exiant-HFA MSA.

39.     Exiant rejected Halperin's demands.

40.     Exiant instead stated that it preferred not to continue doing business with the HFA Companies and blamed its failure to port numbers as requested upon improper procedures undertaken by HFA Services and/or its affiliates, in spite of the fact that HFA Services and Exiant had used the same procedures more than 2 million times over a period of approximately 10 months to port telephone numbers to IPH.

41.     The problems that Exiant claimed it was experiencing in delaying the porting process either were completely fabricated by Exiant or were caused by Exiant changing a long-

term protocol. HFA Services did not do anything improper in connection with porting of numbers but instead followed the same procedures that it had employed successfully throughout the term of the Exiant-HFA MSA.

42.     Exiant deliberately slowed or stopped porting numbers to IPH in May 2021.

43.     Exiant threatened to shut off its services to the HFA Companies as of May 31, 2021 unless the HFA Companies agreed to Exiant's form of Replacement MSA and agreed to pay the entire additional fee for services by no later than the day after the Replacement MSA incepted.

44.     In the event that Exiant terminated its services as of May 31, 2021 without porting out the remaining numbers, HFA Services' customers, and in turn, millions of their customers, would have lost connectivity and would have suffered untold damages, including the possible destruction of businesses and the potential loss of millions of dollars in the aggregate.

45.     This in turn would have exposed HFA Services to potential claims for catastrophic damages.

46.     By email dated May 31, 2021, Halperin advised that HFA Services and its affiliates had "little choice for the protection of our business, our clients and their clients. We will sign and you will receive your payment."

47.     In a separate email on May 31, 2021, Halperin stated that he was signing the Replacement MSA "under duress."

48.     The Replacement MSA was completely unnecessary, and was interposed for the purpose of extracting an additional $163,000 from HFA Services and its affiliates so that Exiant could do exactly what it already was contractually required to do, and so that Exiant could try to wrangle a release from HFA Services of claims for the damage that Exiant and its affiliates had caused HFA Services and its affiliates since the closing of the Transactions.

7

49.     HFA Services paid Exiant $163,000, as demanded by Exiant under the Replacement MSA.

50.     Within less than a month after inception of the Replacement MSA, all of the port-outs were completed.

51.     All conditions precedent to the maintenance of this action have been satisfied or have otherwise been waived.

52.     HFA Services has retained the undersigned law firm to represent it in this action and is obligated to pay the firm a reasonable fee for its services.

53.     Section 12.5 of the Exiant-HFA MSA entitles the prevailing party to recover its reasonable attorney's fees and costs in this action.

**COUNT I**
**DECLARATORY RELIEF**
**DECLARING THE REPLACEMENT MSA VOID AB INITIO**

54.     HFA Services repeats and realleges the allegations set forth in Paragraphs 1-53 as if fully set forth herein.

55.     This is an action for a declaration pursuant to Title 86 of the Florida Statutes.

56.     Exiant was fully capable of completing performance of the porting out of telephone numbers to IPH within the initial term of the Exiant-HFA MSA.

57.     Exiant deliberately failed to port out numbers during the last two months of the initial term of the Exiant-HFA MSA.

58.     Under the Exiant-HFA MSA, in the event that the services provided for under that agreement were not completed within the initial term, it could be renewed.

59.     After Exiant issued its January 2021 termination notice to HFA Services terminating the Exiant-HFA MSA effective at the end of the initial term, it then deliberately failed to perform its duties of porting out the remaining telephone numbers before the expiration of the

8

initial term of the Exiant-HFA MSA in a calculated effort to force HFA Services to enter into the Replacement MSA and pay Exiant additional money over and above the $10 million that the HFA Companies paid to Exiant and its affiliates as part of the Transactions.

60.     Exiant essentially demanded -- and received -- $163,000 and a new Replacement MSA, as ransom from HFA Services in return for (a) Exiant's performance of the very same services that it already was duty-bound to provide pursuant to the Exiant-HFA MSA, and (b) HFA Services' execution of the Replacement MSA.

61.     The Replacement MSA was not supported by any consideration on the part of Exiant. The Replacement MSA demanded payment for services that already were subsumed within the Exiant-HFA MSA.

62.     Exiant should have performed the services subsumed within the Replacement MSA as part of its performance under the Exiant-HFA MSA.

63.     HFA Services entered into the Replacement MSA involuntarily and without exercising its free will.

64.     Exiant threatened HFA Services that if HFA Services did not enter into the Replacement MSA, Exiant would immediately cut off further services to HFA Services.

65.     The only reason that HFA Services entered into the Replacement MSA was because the circumstances permitted no alternative. Had HFA Services not entered into the Replacement MSA, Exiant would have cut off HFA Services from the services that it was providing, stranding HFA Services' customers, potentially causing them millions of dollars in damages, and in turn causing potentially catastrophic losses to HFA Services.

66.     HFA Services entered into the Replacement MSA only as a result of Exiant's coercive act in threatening to cut off services to HFA Services.

9

67.     HFA Services would have been unable to obtain substitute services from another provider in such a way as to avert having to enter into the Replacement MSA.

68.     Pursuant to Section 12.5 of the Exiant-HFA MSA, the prevailing party in any litigation shall be entitled to collect from the other party all costs of litigation, including but not limited to any and all expenses incurred and all reasonably documented attorneys' fees and costs.

69.     A genuine and justiciable controversy exists between HFA Services, on the one hand, and Exiant, on the other hand, in that there is a *bona fide*, actual, present, practical need for a declaration of the parties' respective rights and obligations in relation to the Replacement MSA. Without such a declaration, HFA Services is in doubt as to its rights and obligations respecting the Replacement MSA.

70.     HFA Services and Exiant have actual, present, adverse, and antagonistic interests in this matter; these antagonistic and adverse interests are before the Court by proper process; and the issues raised by HFA Services are not propounded from curiosity and the relief sought is not merely the rendering of legal advice by the Court.

10

WHEREFORE, Plaintiff HFA Services seeks an order (1) declaring the Replacement MSA null and void *ab initio*, alternatively, because it lacked consideration and/or because Exiant coerced HFA Services to execute it under duress; (2) ordering Exiant to refund to HFA Services the $163,000 that it paid to Exiant under the terms of the Replacement MSA; and (3) awarding HFA its attorneys' fees, costs, prejudgment interest, and any further relief deemed just and proper by the Court.

Dated: February 15, 2022

                              Respectfully submitted,

                              DBR LAW, P.A.


                              By: /s/ Daniel B. Rosenthal

                              Daniel B. Rosenthal
                              1900 Glades Road, Suite 270
                              Boca Raton, Florida 33431
                              (561) 853-0991
                              Fla. Bar No. 711934
                              daniel@dbrlawfirm.com
                              rose@dbrlawfirm.com

                              *Counsel for Plaintiff HFA Services LLC*

11

# EXHIBIT A

DocuSign Envelope ID: 37501275-C79D-4031-B061-D0298DDD010B

Confidential & Proprietary            NLA Master Services Agreement

## EXIANT NLA MASTER SERVICES AGREEMENT

### I. CUSTOMER INFORMATION SECTION

Customer Legal Name: HFA Services LLC dba Call 48 and its affiliates
Customer EIN:
Customer State of Incorporation: Florida
Customer Address 7700 Congress Avenue Suite 3216
Customer City/State/Zip code: Boca Raton, Florida 33487

### II. CUSTOMER NOTICES SECTION

For Customer:

| Billing Address Information: | Contract & Rate Notices: |
|---|---|
| Contact Name:<br><br>Email: cogsbilling@call48.com<br><br>***Complete below if different from Customer Address in Customer Information Section***<br>Address:  2865 Sunrise Ave., Suite 220<br>City/State/Zip: Rancho Cordova, CA  95742<br>Phone: 888 444 1111 | Contact Name:<br>Email:<br><br>***Complete below if different from Customer Address in Customer Information Section***<br>Address: _____<br>City/State/Zip: _____<br>Phone: _____ |
| | |

**THIS MASTER SERVICES AGREEMENT** (the "Agreement") is entered into by and between Customer (as identified in the Customer Information Section and Exiant Communications LLC, a Florida limited liability company with its principal place of business at 1213-J Liberty Rd #216 Eldersburg, MD 21784 (hereinafter referred to as "Vendor"). Customer and Vendor are sometimes referred to collectively as the "Parties" or individually as a "Party."

In consideration of the following mutual promises and covenants, the Parties agree as follows:

1   **SERVICES**
   1.1. <u>Purchase</u>. Customer shall purchase from Vendor the Service described herein (the "Services") in accordance with the terms and conditions of this Agreement and its attachments, which are hereby made a part of this Agreement. Vendor, in its sole discretion, may provide the Services directly to Customer, or may cause such Services to be provided by third parties, including one or more Underlying Carriers ("ULCs") whom which Vendor has contracted for such purposes.
   1.2. <u>Services</u>. Customer is ordering Nationwide Local Access Services (NLA), which is an inbound to customer only service. This Agreement does not include or contemplate any outbound traffic from customer to Vendor. Outbound traffic would require a separate Agreement between the Parties.

2   **TERM AND PAYMENT DEFAULT**
   2.1. <u>Term</u>. This Agreement shall be effective as of the Effective Date and continue for One (1) year (the "Initial Term"). After the expiration of the Initial Term, this agreement will continue on successive six (6) month terms (each a "Renewal Term") unless terminated by either Party by written notice no less than sixty (60) calendar days prior to the end of the then Term (the Initial Term and all Renewal Terms shall be collectively referred to as the "Term"). This Agreement is deemed effective as of **June 1, 2020** (the "Effective Date").
   2.2. <u>Payment default</u>. Payment Default. A "Payment Default" shall occur if Customer fails to make full and timely payment for all Services as required under this Agreement (except for Billing Disputes as described in Attachment B) and such failure remains uncorrected for sixty (60) calendar days from the Due Date. In the event of a Payment Default, Vendor may, without liability to Vendor, cease accepting or processing orders for Services. All unpaid and valid charges for Services that remain outstanding beyond the Due Date will be subject to Late Fees written notice from the non-defaulting Party.

DocuSign Envelope ID: 37501275-C79D-4031-B061-D0298DDD010B

Confidential & Proprietary                                        NLA Master Services Agreement

**3   SECURITY, BILLING, PAYMENT**

3.1.   Security Requirements, Billing Cycle and Payment Terms.   Customer specific terms are found in Attachment B to this Agreement.

**4   EQUIPMENT AND TESTING.** Each Party will purchase, install, license (if required), test and operate all equipment for its network necessary to fulfill its obligations under this Agreement.   Testing of new hardware and/or software is required to provide interoperability between Vendor and Customer as mutually agreed to by the Parties.   In cases where Vendor is utilizing a third party to provide some or all of the Services, Customer may be required to work directly with the third party on provisioning and testing of those third-party Services.   Customer agrees that all services will be deemed delivered by Vendor from Delaware jurisdiction and or other locations identified by Vendor at any time in the future.

**5   OWNERSHIP.** All computer programs, software, drawings, diagrams, specifications, Confidential information and other information and materials, and all intellectual property therein or based thereon, now owned by or developed by or for Vendor, or which may be licensed or sublicensed by Vendor, or which may be owned by or developed by or for Vendor, in connection with delivering the Services to Customer as a result of or related to this Agreement, whether or not developed at the specific request of Customer, shall remain the sole and exclusive property of Vendor and Customer acquires no rights or licenses, express or implied, in same by virtue of this Agreement or the provision of the Services or other services hereunder, unless otherwise expressly set forth in a separate written agreement between Vendor and Customer.

**6   SURVIVAL PROVISIONS.** The provisions for Ownership, Limitation of Liability and Indemnification and Confidential Information shall survive the expiration or the termination of this Agreement.

**7   CONFIDENTIAL INFORMATION.** For purposes of this Agreement, the Party disclosing Confidential Information is the "Discloser", and the Party receiving Confidential Information is the "Recipient." Confidential Information means all information concerning the Parties' business including, but not limited to, all tangible, intangible, visual, electronic, present, or future information such as: (a) trade secrets; (b) financial information, including pricing; (c) account contact information; (d) vendor contact information; (e) business information, including operations, planning, marketing interests, and products; (f) the terms of any agreement between the Parties and the discussions, negotiations and proposals related to that agreement; and (g) any proprietary methodology utilized by either of the parties in the delivery of the Services. Confidential Information disclosed to the other Party must be clearly identified as Confidential Information at the time of disclosure.

7.1.   Confidential Information is to be used by the Recipient only for the purposes contemplated by this Agreement, and the Recipient may not disclose the same to anyone other than the Recipient's employees, accountants, attorneys, consultants, or other representatives on a need to know basis and who agree to be bound by the terms of this Section or to law enforcement acting in accordance with its lawful authority. Proprietary Information may not be retained by the Recipient and all originals and any copies or summaries shall be returned to the Discloser no later than upon termination of this Agreement.

7.2.   Neither Party may use the name, logo, trade name, brand name, service marks, trademarks, copyright, patent, business process, printed materials, or any other intellectual property of the other Party or its respective affiliates, in any promotional or advertising material, statement, document, press release, broadcast, provisioning of services, or otherwise without the prior written consent of the other Party, which consent may be granted or withheld at the other Party's sole discretion. Each Party's name and the names of its Affiliates are proprietary, and nothing herein constitutes a license authorizing their use, and in no event shall Customer attempt to sell service to its End Users using the name of Vendor or its Affiliates. In addition, Customer shall not state to End Users or prospective End Users: (i) that they will be Vendor Customers or that they may obtain Vendor service from Customer; or (ii) that Customer has any relationship with Vendor other than an Agreement to purchase Services on a wholesale basis.

7.3.   Each Party also agrees not to circumvent the other Party, either directly or indirectly, through the use of Proprietary Information.

7.4.   Each Party acknowledges that a breach or threatened breach of this Section may cause the Discloser irreparable harm, which cannot be adequately compensated by monetary damages. Accordingly, in the event of any such breach or threatened breach, the Recipient consents to equitable relief, including temporary restraining orders or preliminary or permanent injunctions, restraining the Recipient from any violation of the terms of this Agreement, without being required to post bond or other security of any character, and without having to prove or otherwise establish the inadequacy of available remedies at law for the breach or threatened breach of the Recipient.

DocuSign Envelope ID: 37501275-C79D-4031-B061-D0298DDD010B

Confidential & Proprietary                                                         NLA Master Services Agreement

**8   LIMITATION OF LIABILITY; DISCLAIMER OF WARRANTIES**

WITHOUT LIMITING CUSTOMER'S OBLIGATION TO PAY FOR SERVICES AND ANY OTHER EXPRESS FINANCIAL OR LIABILITY PROVISIONS PROVIDED FOR IN THIS AGREEMENT, NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY INDIRECT OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR RELATED TO THE PERFORMANCE OF THIS AGREEMENT. VENDOR MAKES NO WARRANTIES, EXPRESS OR IMPLIED, AS TO ANY SERVICE PROVISIONED HEREUNDER. VENDOR SPECIFICALLY DISCLAIMS ANY AND ALL IMPLIED WARRANTIES; INCLUDING WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR TITLE OR NON-INFRINGEMENT OF THIRD-PARTY RIGHTS. Customer acknowledges and accepts the reasonableness of the foregoing disclaimer and limitations of liability. No cause of action under any theory which occurred more than one (1) year prior to the institution of a legal proceeding alleging such cause of action may be asserted by either Party against the other and shall be barred by this agreed limitation.

**9   REGULATORY COMPLIANCE AND INDEMNIFICATION**

9.1.  This Agreement is made expressly subject to all present and future valid orders and regulations of any authority having jurisdiction of the subject matter hereof, and to the laws of the United States, or any of its States, or any foreign governmental agency having jurisdiction.

9.1.1. In the event this Agreement, or any of its provisions, shall be found contrary to, or in conflict with, any such order, rule, regulation, or law, this Agreement shall be deemed modified only to the extent necessary to comply with any such order, rule, regulation, or law and shall be modified in such a way as is consistent with the form, intent, and purpose of this Agreement.

9.1.2. If the Federal Communications Commission, a state Public Utilities Commission or a court of competent jurisdiction issues a rule, regulation, law, or order after the date of this Agreement which has the effect of canceling, changing, or suspending any material term or provision of this Agreement of any of the Service Orders (collectively, "Regulatory Requirement"), then this Agreement shall be deemed modified in such a way as the Parties mutually agree is consistent with the form, intent and purpose of this Agreement, to the extent necessary to comply with such Regulatory Requirement. Should the Parties not be able to agree on the modifications necessary to comply with a Regulatory Requirement within fifteen (15) days after the Regulatory Requirement is effective, the Parties shall submit the matter to arbitration in accordance with paragraph 12.4 of this Agreement.

9.1.3. If reporting obligations or requirements are imposed upon Vendor by any regulatory or governmental third party or regulatory agency in connection with either this Agreement or the Services, including use of the Services by Customer or its End Users, Customer agrees to assist Vendor in complying with such obligations and requirements, as reasonably required by Vendor.

9.1.4. The Parties acknowledge and agree that both (i) certain equipment, software and technical data which may be provided or utilized in connection with the furnishing of the Services hereunder; and (ii) the use of such services may be subject to export, re-export or import controls under the United States Export Administration Regulations or similar regulations of the United States or of any other country.

9.2.  Basic 911 and E911 Service Limitation. If Customer is ordering VoIP Call Origination or VoIP Call Termination Services, Customer understands and agrees that the Service cannot complete calls to Basic 911, E911 or other emergency calling services and that Customer will not utilize the Service in the provision of any offering to its end users that would require the Service to provide Basic 911 or E911 functionality. Customer agrees that it shall be solely liable for and shall indemnify Vendor from and against any and all lawsuits, claims, demands, penalties, losses, fines, liability, damages and expenses, including reasonable attorney's fees, arising out of or in any way relating to such inability to complete Basic 911, E911, and other emergency calls, including, without limitation, any actual failure of any such call to be completed.

9.3.  Customer knowingly and expressly indemnifies and holds harmless Vendor from and against any loss, cost, claim, liability, damage or expense (including reasonable attorneys' fees) to third parties, relating to any claim or allegation that any access charges or other inter-carrier compensation-related payments are owed as a result of Customer's performance of this Agreement. Customer acknowledges and agrees that Vendor services are only delivered via IP protocol directly, and the handoff to the Customer occurs from the Ethernet port of Vendor's Delaware network equipment. Customer shall not be compensated, and Customer waives any and all potential, current, or future claims to any revenues Vendor receives related in any way to Customer.

**10  TAXATION**

Customer shall be responsible for all Taxes that arise in any jurisdiction, including sales taxes, Universal Service Fees, use, consumption, and other taxes (excluding Taxes on Vendor' income) that are directly and solely attributable to Customers purchase and use of the Service. Should any taxes, surcharges, charges or fees be passed onto Vendor by its ULCs that are

DocuSign Envelope ID: 37501275-C79D-4031-B061-D0298DDD010B

Confidential & Proprietary                                                    NLA Master Services Agreement

directly attributable to Customers purchase and/or use of the Service, Vendor shall pass these onto the Customer without markup and Customer shall pay these amounts to Vendor. Vendor will in turn pay these amounts to its ULCs. Should Customer claim an exemption of any value-added, sales, use, or other tax, Customer will provide officially documented/certified proof of such exemption to Vendor. It is Customer's responsibility to ensure its exempt status, and the proof thereof, remains current. In no event will Vendor be liable for any taxes due by Customer and Customer will indemnify Vendor if any such claim for taxes is made. Vendor will invoice Customer for taxes and other charges, if any, that are not covered by a valid tax exemption certificate properly filed with Vendor. Customer represents and warrants that it has obtained and shall maintain all approvals, consents, governmental authorizations, licenses and permits as may be required to utilize the Services purchased from Vendor under this Agreement. Customer will be responsible for paying all appropriate taxes, penalties and interest that may be assessed by any tax authority.

## 11  CUSTOMER RESALE AND END USER RESPONSIBILITIES

11.1. Customer is solely responsible for obtaining all licenses, approvals, and regulatory authority for its use and operation of the Services and the provision of Services to its End Users. In connection with its resale of the Services, Customer is solely responsible for all Customer service, and other service-related requirements of its End Users, and Vendor shall have no liability to Customer's End Users under this Agreement. Customer's payment obligations hereunder are not contingent upon Customer's ability to collect payments or charges from its End Users, Affiliates, agents, brokers or re-sellers.

11.2. Customer shall save, protect, indemnify and hold Vendor harmless from and against any and all claims, demands, suits, actions, losses, damages, assessments or liabilities of any nature whatsoever arising directly or indirectly out of: (a) any damages caused by intentional or illegal acts of Customer, in connection with its use of or resale of the Services; (b) Customer's or End User's use, resale or modification of the Services, or (c) any claims by Customer's Customers or ultimate End Users alleging any defect in any of the Services.

11.3. The terms, representations, warranties and agreements of the Parties set forth in this Agreement are not intended for, nor shall they be for the benefit of or enforceable by, any third party (including, without limitation, Customer's Affiliates and End Users).

## 12  MISCELLANEOUS

12.1. Notices.  Except as otherwise provided in this Agreement, all non-Rate change required or permitted notices shall be in writing and shall be deemed to be effective upon dispatch if sent by (i) overnight courier or hand delivery, (ii) facsimile, with confirmation by letter, or (iii) electronic (email) transmission. (Rate Notifications are addressed in Attachment B). Notice given by facsimile shall be deemed given when transmitted, provided that the sender shall have received a transmission report indicating successful transmission of all pages of the notice to the correct facsimile number. Notice by electronic mail shall be deemed given when the sending Party receives validation from the receiving Party's e-mail server. Either Party may change its Notice information by giving prior written notice according to the terms herein. Notices to Vendor may be delivered to the below. Notices to Customer will be delivered in accordance with the information in Section II Customer Notices Section of this Agreement.

All Notices for Vendor:
Exiant
Legal Department
1213-J Liberty Rd #216 Eldersburg, MD 21784
Email: legal@exiantcom.com

12.2. Waiver.  No term or provision of this Agreement shall be deemed waived and no breach or default shall be deemed excused unless such waiver or consent shall be in writing and signed by the Party claimed to have waived or consented. No consent by any Party to, or waiver of, a breach or default by the other Party, whether express or implied, shall constitute consent to, waiver of, or excuse for any different or subsequent breach or default or shall be construed as a continuing waiver of such right or a waiver of any other provision hereunder.

12.3. Force Majeure.  For purposes of this Agreement, "Force Majeure" means any event or circumstance beyond the reasonable control of a Party which affects the performance by such Party of its obligations hereunder, including but not limited to, any war, declared or not, or hostilities, or belligerence, blockade, revolution, insurrection, acts of terror, riot, public disorder, expropriation, requisition, confiscation or nationalization, whether imposed by law, decree or regulation by any governmental authority, or fire, unusual flood, earthquake, volcanic activity, storm, typhoons, lightning, unforeseen changes to Vendor's ULC contracts, performance of Vendor's ULCs, or any event, matter or thing, wherever occurring that is clearly outside of either Party's reasonable control. In the event of a Force Majeure Event, neither Party shall be liable to the other for any delay or failure in performance of any

DocuSign Envelope ID: 37501275-C79D-4031-B061-D0298DDD010B

Confidential & Proprietary                                    NLA Master Services Agreement

part of this Agreement, and the time for performance of such obligation shall be excused for the period of such delay or prevention and extended for a period equal to the period of such delay or prevention. The Party claiming relief under this Section shall notify the other in writing of the existence of the Force Majeure Event. Notwithstanding this provision, Customer shall in no way be relieved of any of its payment obligations as provided herein.

12.4. Choice of Law. This Agreement will be governed by and construed in accordance with the Laws of the State of Florida, USA, without regard to conflicts of law principles.

12.5. Litigation; Waiver of Jury Trial; Arbitration; Forum Selection. Any issue, claim, or dispute arising out of or relating to this Agreement, including but not limited to the breach, termination, enforcement, interpretation or validity of this Agreement, billing, rate or payment dispute or a tort claim or action, shall be determined as follows. THE PARTIES WILLINGLY, VOLUNTARILY AND KNOWINGLY WAIVE TRIAL BY JURY IN ANY SUCH ACTION, PROCEEDING, ISSUE CLAIM OR DISPUTE RELATED TO OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS BETWEEN THE PARTIES, INCLUDING BUT NOT LIMITIED TO ANY TORT CLAIMS BETWEEN THE PARTIES. If the amount in controversy or damages claimed is $30,000 or less (exclusive of interest, costs and attorneys' fees), then the District Court for Baltimore City or Baltimore County shall have the sole and exclusive jurisdiction and venue. If the amount in controversy or damages claimed exceeds the sum of $30,000 (exclusive of interest, costs, and attorneys' fees), then all claims, issues, or disputes shall be determined by binding arbitration before a single arbitrator to be administered by the Judicial Arbitration and Mediation Service ("JAMS") pursuant to its Comprehensive Arbitration Rules and Procedures, and such arbitration shall be held in Baltimore City, Baltimore County, or Greenbelt, Maryland or at any office of JAMS in Maryland. If, at the time the arbitration is to be commenced, JAMS does not have a Maryland office or if JAMS no longer exists or does not accept the case for arbitration, then arbitration shall be administered by the American Arbitration Association ("AAA"), in Maryland, pursuant to its Comprehensive Arbitration Rules for Complex Commercial Disputes. Any award entered by the arbitrator may be confirmed and entered as a judgment by any court having jurisdiction. This clause shall not preclude the parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction or from seeking any equitable remedy that is not within the jurisdiction of the District Court of Maryland or can be awarded by an arbitrator, such as injunctive relief or declaratory judgment. With regard to any arbitration between the parties, each Party will be responsible for paying its own share of the fees and costs during the arbitration, including but not limited to filing fees and the hourly fees of the arbitrator. The prevailing party shall be entitled to reimbursement from the other party for its share of the fees and costs of the arbitration and for all other costs of the arbitration, including but not limited to reasonable attorneys' fees and costs. The arbitrator is authorized to include such fees and costs in any award. With regard to any litigation between the parties, the prevailing party shall be entitled to collect from the other party all costs of litigation, including but not limited to any and all expenses incurred and all reasonably documented attorneys' fees and costs. It is the express intent and agreement of the parties that this provision shall not be extinguished by or merged into any award, order, decree or judgment, but shall survive such award order, decree, or judgment.

12.6. Headings; Section References. The headings and other captions in this Agreement are for convenience and reference only and shall not be used in interpreting, construing or enforcing any of the provisions of this Agreement. All references to Sections in this Agreement are to sections of this Agreement.

12.7. No Partnership. Nothing contained in this Agreement shall be construed to create a partnership or joint venture between the Parties or their successors in interest or permitted assigns. The relationship between the Parties is that of independent contractors and shall not be that of partners, and nothing herein shall be deemed to constitute a partnership, agency, joint venture, employee relationship or franchise between them or a merger of their assets or their fiscal or other liabilities or undertakings. Neither Party shall have the right to bind the other Party, or otherwise or make any representations or guarantees on behalf of the other, except as expressly provided for in this Agreement.

12.8. Counterparts. This Agreement may be executed in any number of counterparts and any Party hereto may execute any such counterpart, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument. This Agreement shall become binding when one or more counterparts taken together shall have been executed and delivered (which deliveries may be by facsimile or email) by the Parties.

12.9. Proper Execution. The submission by Vendor to Customer of this Agreement in an unsigned form shall be deemed to be a submission solely for Customer's consideration and not for acceptance and execution. Such submission shall have no binding force or effect, shall not constitute an option or an offer and shall not confer any rights, irrespective of any reliance thereon, change of position or partial performance. The submission of this Agreement for execution by Customer and the actual execution thereof by Customer and delivery to Vendor by

Page 5 of 12

DocuSign Envelope ID: 37501275-C79D-4031-B061-D0298DDD010B

Confidential & Proprietary                 NLA Master Services Agreement

Customer shall similarly have no binding force and effect on Vendor unless and until Vendor shall have executed this Agreement and a counterpart hereof executed by both Vendor and Customer.

12.10.     Mutual Drafting. This Agreement is the mutual product of the Parties hereto and each provision hereof has been subject to the mutual consultation, negotiation and agreement of each of the Parties and shall not be construed for or against any Party hereto.

12.11.     Amendment; Waiver. This Agreement may be amended by the Parties only by execution of an instrument in writing signed on behalf of each of the Parties hereto. Any extension or waiver by any Party of any provision hereto shall be valid only if set forth in an instrument in writing signed on behalf of such Party. No waiver of any breach of any agreement or provision contained herein shall be deemed a waiver of any preceding or succeeding breach of any other agreement or provision herein contained. No extension of time for the performance of any obligation or act shall be deemed an extension of time for the performance of any other obligation or act.

12.12.     Business Days. If any date herein set forth for the performance of any obligations by any Party or for the delivery of any instrument or notice as herein provided should fall on a Saturday, Sunday or Legal Holiday (hereinafter defined), the compliance with such obligations or delivery shall be deemed acceptable on the next business day following such Saturday, Sunday or Legal Holiday. As used herein, the term "Legal Holiday" shall mean any day on which banking institutions are required to close in the State of Maryland. As used herein, the term "Business Day" means any day other than a Saturday, Sunday or Legal Holiday.

12.13.     Binding Effect. If any provision of this Agreement is held to be invalid or unenforceable, the remainder of the Agreement will remain in full force and effect, and such provision will be deemed to be amended to the minimum extent necessary to render it enforceable.

12.14.     Assignment. Customer shall not assign, sell or transfer this Agreement or any of its rights or obligations hereunder, including the right to receive the Services, whether by operation of law or otherwise, without the prior written consent of Vendor. This Agreement shall inure to the benefit of and be binding upon the Parties hereto and their respective affiliates, successors and assigns

12.15.     Authority. The Parties represent and warrant that: (i) the full legal name of the legal entity in this Agreement is accurately set forth herein; (ii) the person signing this Agreement has been duly authorized to execute this Agreement on the Party's behalf; and (iii) the execution hereof is not in conflict with law, the terms of any charter, bylaw, articles of association, or any agreement to which the Party is bound or affected. Vendor may act in reliance upon any instruction, instrument, or signature reasonably believed by Vendor to be genuine. Vendor may assume that any employee of Customer who gives any written notice, Order Form, or other instruction in connection with this Agreement has the authority to do so.

12.16.     Entire Agreement. This Agreement, together with the Schedules and Exhibits (including any and all agreements the form of which are included as Exhibits) attached hereto, all of which are incorporated by reference, sets forth the entire understanding of the Parties hereto with respect to the transactions contemplated hereby. Any and all previous agreements and understandings between or among the Parties regarding the subject matter hereof, whether written or oral, are superseded by this Agreement, and the Parties hereby represent to one another that there are no other agreements, understandings or representations between them that are not set forth within this Agreement.

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be duly executed effective as of the day and year last written below.

EXIANT COMMUNICATIONS LLC             Customer: _CALL 48 LLC_

By: _____             By: _Michael Halperin_
        (signature)                               7E565715060B424 (signature)

Name: James Finneran                     Name:   Mike Halperin

Title: CEO                                      Title:   CEO

DocuSign Envelope ID: 52F24742-490A-49F8-95A4-DF5DD7BC0192

Confidential & Proprietary                                    NLA Master Services Agreement

Customer shall similarly have no binding force and effect on Vendor unless and until Vendor shall have executed this Agreement and a counterpart hereof executed by both Vendor and Customer.

12.10.    Mutual Drafting.  This Agreement is the mutual product of the Parties hereto and each provision hereof has been subject to the mutual consultation, negotiation and agreement of each of the Parties and shall not be construed for or against any Party hereto.

12.11.    Amendment; Waiver.  This Agreement may be amended by the Parties only by execution of an instrument in writing signed on behalf of each of the Parties hereto.  Any extension or waiver by any Party of any provision hereto shall be valid only if set forth in an instrument in writing signed on behalf of such Party. No waiver of any breach of any agreement or provision contained herein shall be deemed a waiver of any preceding or succeeding breach of any other agreement or provision herein contained.  No extension of time for the performance of any obligation or act shall be deemed an extension of time for the performance of any other obligation or act.

12.12.    Business Days.  If any date herein set forth for the performance of any obligations by any Party or for the delivery of any instrument or notice as herein provided should fall on a Saturday, Sunday or Legal Holiday (hereinafter defined), the compliance with such obligations or delivery shall be deemed acceptable on the next business day following such Saturday, Sunday or Legal Holiday.  As used herein, the term "Legal Holiday" shall mean any day on which banking institutions are required to close in the State of Maryland.  As used herein, the term "Business Day" means any day other than a Saturday, Sunday or Legal Holiday.

12.13.    Binding Effect.  If any provision of this Agreement is held to be invalid or unenforceable, the remainder of the Agreement will remain in full force and effect, and such provision will be deemed to be amended to the minimum extent necessary to render it enforceable.

12.14.    Assignment.  Customer shall not assign, sell or transfer this Agreement or any of its rights or obligations hereunder, including the right to receive the Services, whether by operation of law or otherwise, without the prior written consent of Vendor.  This Agreement shall inure to the benefit of and be binding upon the Parties hereto and their respective affiliates, successors and assigns

12.15.    Authority.  The Parties represent and warrant that: (i) the full legal name of the legal entity in this Agreement is accurately set forth herein; (ii) the person signing this Agreement has been duly authorized to execute this Agreement on the Party's behalf; and (iii) the execution hereof is not in conflict with law, the terms of any charter, bylaw, articles of association, or any agreement to which the Party is bound or affected.  Vendor may act in reliance upon any instruction, instrument, or signature reasonably believed by Vendor to be genuine.  Vendor may assume that any employee of Customer who gives any written notice, Order Form, or other instruction in connection with this Agreement has the authority to do so.

12.16.    Entire Agreement.  This Agreement, together with the Schedules and Exhibits (including any and all agreements the form of which are included as Exhibits) attached hereto, all of which are incorporated by reference, sets forth the entire understanding of the Parties hereto with respect to the transactions contemplated hereby. Any and all previous agreements and understandings between or among the Parties regarding the subject matter hereof, whether written or oral, are superseded by this Agreement, **and the Parties hereby represent to one another that there are no other agreements, understandings or representations between them that are not set forth within this Agreement.**

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be duly executed effective as of the day and year last written below.

EXIANT COMMUNICATIONS LLC                    Customer: CALL 48 LLC

By: _Jim Finneran_____                 By: _____
        (Signature)                                        (signature)

Name:  James Finneran                           Name:   Mike Halperin

Title: CEO                                      Title:   CEO

Page 6 of 12

DocuSign Envelope ID: 37501275-C79D-4031-B061-D0298DDD010B

## ATTACHMENT A
### SERVICES

Introductory Note: Any term defined in this Attachment and not also located within the Agreement and/or its other supporting attachments is provided for convenience only and shall not alter or define any other term within the Agreement or its other supporting attachments.

- Billing Increments – are six seconds; Vendor bills 6/6 for inbound national local access.
- CDR – means Call Data Records
- Channel or "VoIP port" – The capacity to operate one VoIP call at one time.
- DID - Direct Inward Dial number, otherwise known as a local telephone number ("TN") NPA-NXX-XXXX
- DL - Directory Listing
- Donating Carrier – the carrier from whom a number is being ported
- ICB – Individual Case Basis
- Inbound – Calls that are received by Vendor for delivery to Customer for completion.
- LERG - Telcordia LERG Routing Guide
- LNP – Local Number Portability. Defined by the Federal Communications Commission (FCC).  The FCC regulates the porting process of DIDs between carriers. Vendor porting process are provided by its ULCs.
- MOU – means Minutes of Use as defined by the Billing Increments
- MRC - means Monthly Recurring Charge.
- NRC - means Non-Recurring Charge.
- Native Numbers – TNs that are assigned directly to the Exiant SPID by NANPA and then assigned by Vendor to Customer for its use. (as opposed to numbers ported in to Vendor by Customer from other carriers).
- Onnet – Rate Centers and or areas Vendor provides native numbers to Customer.
- Offnet - Rate Centers and or areas Vendor has not provided native numbers to Customer.
- Outbound – Calls that are sent from Customer to Vendor for processing and or further completion.
- Rate Center – As defined in the LERG. The specific geographic point and corresponding geographic area which are associated with one or more particular NPA/NXX codes that have been assigned to a local exchange carrier for its provision of exchange services. Examples: AL ABBEVILLE
- RPM – means Rate Per Minute
- TN – Telephone Number aka DID, Number
- ULC – Underlying Carrier
- Vendor Network - means the network either owned by Vendor or those of the third party ULCs that Vendor utilizes to supply the Service to Customer.

**A1.0**  **National Local Access (NLA) Service:** Provides packetized interconnection for the delivery of traffic to Customer, on TNs assigned to Customer by Vendor. The NLA Service is intended for voice traffic transmission. Under this Service, Customer and Vendor will interconnect their respective IP networks and Vendor will deliver such local traffic to Customer as IP packets utilizing SIP signaling. Customer acknowledges and agrees that Customer is accepting the IP handoff directly from the Vendor session border controller located in the Vendor's DE facility. Any protocol other than SIP, and/or any other codec other than G.711 and G.729 will be addressed as a separate amendment to this agreement. Customer is responsible for termination of the traffic to Customer's end-users.

**A2.0**  **NLA Services:** The NLA Service is provided as either On-net or Off-net coverage (i.e. each identifies a specific set of Rate Centers that that it encompasses; sometime referred to as either the On-net or Off-net "footprint". Each has a separate applicable Channel, TN, and Rate Per Minute ("RPM") and are included below in the Pricing Tables.

    **A2.1**  **Channel:** *Applicable where Customer orders Channels to provide capacity for calls placed using the TNs ordered and/or ported by Customer.* Channels are billed as an MRC in advance at the beginning of each month. Thereafter, Customer shall be billed for the total number of Channels ordered, regardless of Customers actual usage for each month going forward unless Customer submits a disconnect order for some or all of the Channels. A disconnect order must be submitted at least thirty (30) days in advance of the disconnection. The number of Channels ordered prior to the beginning of a month will determine the Channel MRC. Should Customer order additional Channels during a month (i.e. after that particular months Channel MRC charge has already been billed), then the next month's invoice shall contain the additional charges for the ordered Channels

DocuSign Envelope ID: 37501275-C79D-4031-B061-D0298DDD010B

Confidential & Proprietary                                    NLA Master Services Agreement

prorated, if appropriate. Thereafter, Customer shall be billed for the total number of Channels provisioned by Vendor, regardless of Customers actual usage for each month going forward. The Tier Pricing Tables list the prices to be charged Customer for each Tier. For example, if Customer orders 48 Channels at $1.00 per Channel then the Channel MRC Charge will be calculated as 48 x $1.00 = $48.00.

**A2.2**    **TN MRC and NRC:** Vendor will provide local number portability, if available to Vendor, and as described herein. Customer agrees and understands that when Vendor is unable to port numbers assigned to Customer by Vendor (e.g. technical improbability, regulatory issues or due to agreements with underlying providers), any such numbers shall remain with Vendor. Vendor will provide, if available to Vendor, in-bound (Port-In) and out-bound (Port-Out) number porting service ("Porting Service") on behalf of Customer in accordance with applicable Federal and state regulatory rules, decisions, implementing procedures and applicable law. Customer may procure from Vendor, TNs from Rate Centers in local markets as defined by Vendor, where such numbers are available ("Native TNs"). Under no circumstances shall the failure of Vendor to provide Customer with TNs be deemed a breach by Vendor under the Agreement. Vendor will make commercially reasonable efforts to provide TNs where available.

    **A2.2.1**    **Port-In:** Customer may elect to port an existing TN to Vendor ("Port-In") for use with the Services contemplated by this Agreement. Vendor will support all valid requests and will cooperate with Customer to perform any Port-In in accordance with Customer's directions and Vendor standard operating procedures. In order to Port-In a TN, Customer will be required to provide Vendor with a Letter of Authorization (LOA) from the applicable End User in form and substance as is reasonably required by Vendor and a copy of the then current TN carrier's invoice with sufficient detail as required to process a porting request. Customer hereby represents and warrants to Vendor that Customer has all necessary rights and authority to Port-In said TN and Customer hereby agrees to indemnify and hold harmless Vendor, its Affiliates, and their officers, directors, employees, and agents from and against any third-party claim related to or arising from any Port-In or request for Port-In. Customer shall defend and indemnify Vendor against any and all claims related to the Porting Services, including, without limitations, any End User, LEC or regulatory agency claims (including all "slamming claims") arising from or related to Customers use or failure to use or provide valid LOAs. Customer shall pay Vendor an amount equal to such charges within five (5) business days of receipt of written notice of the assessment of such charges on Vendor.

    **A2.2.2**    **Port-Out:** Customer acknowledges and agrees that Vendor may receive requests by Customer or third parties on behalf of Customer to port a TN to a third-party provider (Port-Out). Customer understands and agrees that Vendor will support all such requests and will cooperate with the Port-Out in accordance with Vendor standard operating policies and practices. Customer also understands and agrees that the option to Port-Out TNs from Vendor to an alternate provider is subject to Vendor's agreements. If the TNs can be Port(ed)-Out, there may be charges that will be incurred by Customer which is identified in the Pricing Table. Vendor will not cease billing for a TN unless Customer notifies Vendor of all Port-Out of numbers at least thirty (30) days prior to Customer's efforts to Port-Out TNs. Until Customer notifies Vendor of its intent to Port-Out a TN – Vendor shall continue to bill Customer and Customer agrees to pay for all TNs provisioned with Vendor. Porting by Customer of TNs pursuant to this section shall in no way relieve Customer of any of its obligations under this contract. Customer TNs shall be reclaimed by Vendor on the date of Termination of this Agreement.

    **A2.2.3**    **TN MRC Charge:** Customer will be billed for the number of TNs ordered multiplied by the applicable rate found in the Tier Pricing Tables below on a Monthly Recurring Basis (MRC). Customer will be billed for all TNs in service at the beginning of a month. No pro-rating of TN charges will occur for any TNs that are Ported-Out during a month. Cancellation of TNs require at least fifteen (15) days prior notice. If a TN is not cancelled at least fifteen (15) days prior to the start of a month, Customer will be invoiced for the TN for that month.

    **A2.2.4**    **LNP TN NRC Charge:** Customer may choose to Port existing TNs from another Provider to Vendor (commonly referred to as Local Number Portability or LNP) to be used with this Service. Numbers Ported to Vendor will incur a one-time (NRC) charge for each number ported which is identified in the Pricing Tables below.

    **A2.2.5**    **Rate Per Minute (RPM) Charges:** *Applicable where Customer orders Service that will be billed based on the MOUs generated by Customer in each billing period (sometimes referred to as Usage).* Customer will be billed for each MOU in a billing cycle at the RPM listed in the Pricing Table below. The MOU will be the actual conversation minutes of use of each call measured from receipt of answer supervision to receipt of disconnect supervision rounded up to the next 6 second increment. Each call duration will be multiplied by the Customer's contracted rate(s). All of the rated calls will be added

Page 8 of 12

DocuSign Envelope ID: 37501275-C79D-4031-B061-D0298DDD010B

Confidential & Proprietary                                    NLA Master Services Agreement

up and the total rounded up to the nearest cent. CDRs will be made available to Customer on a monthly basis via portal.

A2.2.6    **Ancillary Charges:** Customer may order additional services, the rates for which are found in the pricing tables herein.

A2.2.7    **Minimum Monthly Commitment:** Customer must order, and Customer agrees that it will pay, a minimum of $0.00 per month worth of DS0's and/or RPM MOUs (Usage) beginning in the second full month after Vendor has native TNs assigned to Vendor's OCN/SPID in each of the fifty (50) states, and is providing Customer with native numbers for NLA services in each and every one of the fifty (50) states in the United States of America.

A2.2.8    **Legal Support Per Incident Charge:** Customer may be charged $5 per response by Vendor to inquiries and subpoenas, if in Vendors reasonable determination, that Customer's use of the Service is causing above average Vendor support in replying to legal inquiries and subpoenas.

A2.3    **Pricing:** The intention is to provide all services to customer at a straight pass through of Vendors actual costs to provide service to Customer. At cost means no markup or extra charges above the invoiced amounts from third parties to Vendor.

A3.0    **Customer Order Forms:** All Services ordered by Customer shall be submitted via Vendor provided Customer Order Forms or via email acceptable to Vendor. No order is deemed valid until accepted in writing by Vendor. Vendor does not guarantee the availability of Services, nor does Vendor guarantee the capacity availability in all Rate Centers or areas.

A4.0    **Customer 911 Liability:** Vendor does not provide Customer with outbound calling services. Customer shall block and shall assume full responsibility for the blocking of emergency service calls and hereby agrees to indemnify and hold Vendor, and its personnel, harmless against all suits, liabilities, damages, penalties, and the like, relating to or arising from, injuries, death, and/or property damage from any improper routing of 911, 9-911 or other emergency services calls that originate from Customer's location or network. Any changes to the TN Service or to Customer's use of the Vendor network that affects the blocking or routing of 911, E-911 or other emergency calls must be approved, in advance, by Vendor.

A5.0    **VoIP Connectivity:** VoIP TN Service is available through one connectivity method: Public Internet. The QOS setting on Public Internet will be Best Effort, as defined in Newton's Telecom Dictionary. Any other form of connectivity other than the Public Internet will be addressed in an addendum to this Agreement.

A6.0    **Interoperability Test:** As a condition to receiving VoIP TN Service, Customer will participate in an Interoperability Test with Vendor to ensure interoperability of Customer's VoIP network components and signaling protocols with the Vendor network. Such testing will take place over a public Internet connection and is designed solely to ensure basic network interoperability. Such testing shall not constitute a test of overall service and quality metrics. This testing is to ensure basic network interoperability.

A7.0    **Network Footprint/Coverage Changes:** The coverage/footprint of the Vendor Network may change from time to time. This includes adding additional coverage (expanding the footprint), deleting coverage or movement of some areas from one Tier footprint to the other. Vendor will make commercially reasonable efforts to minimize changes that delete coverage or the movement of areas of coverage from one Tier to the other. Vendor will provide at least ninety (90) days' notice in advance of any such changes to Customer.

# ATTACHMENT B

## BILLING, PAYMENT, AND SECURITY

**B1   SECURITY, CREDIT LIMIT**

B1.1.    **Credit Limit.** Customer credit limit has been set by Vendor at $50,000 per Billing Cycle. The credit limit extended by Vendor to Customer is the maximum amount of charges that may be incurred during any one (1) billing cycle, as specified herein. Should incurred charges exceed the credit limit during any billing cycle, Vendor may, at its sole discretion, request payment, which will be due within ten (10) business days after email notification, in an amount of any or all unpaid portions of the current charges, to bring the unpaid incurred charges back within the predetermined credit limit. Vendor is not obligated to provide services in excess of Customer's credit limit.

**B2   BILLING, PAYMENT**

DocuSign Envelope ID: 37501275-C79D-4031-B061-D0298DDD010B

Confidential & Proprietary                  NLA Master Services Agreement

**B2.1.**     **Billing Terms, Payment Terms, Lookback Billing Period.**

    **B2.1.1.**   **Billing Commencement.** Vendor Billing shall not commence to Customer until the second month after Vendor has delivered Customer native TNs for Customer's use in each of the a fifty (50) of the states in the United States of America. Until that event, Vendor shall not invoice customer for any charges whatsoever.

    **B2.1.2.**   **Billing Cycle.** Customer shall pay Vendor for Services ordered by Customer and provided by Vendor, pursuant to the terms of this Agreement. Vendor will invoice MRCs to Customer on the first of each month when applicable. MRC and NRC services turned up during a billing cycle will be invoiced on a prorated basis as of the in-service date. For all RPM, variable or usage charges, Vendor will invoice Customer monthly. All amounts stated on each invoice will be due and payable within thirty (30) days of the date of the invoice ("Due Date). Vendor will notify Customer electronically or in writing upon installation of Service. Charges will commence upon the sending of this notification to Customer.

    **B2.1.3.**   **Lookback Billing Period.** Vendor shall invoice Customer for services rendered within sixty (60) days of that services being actually provided or utilized by Customer, whichever time period is shorter. If vendor does not bill within sixty days of the service being used by Customer, vendor shall be barred from invoicing and or collecting for any unbilled services. The sixty (60) billing window is called the lookback period. The intent of this paragraph is that Vendor is solely responsible for invoicing charges in a timely manner, and vendors failure to invoice and or send an invoice to Customer for any reason whatsoever during the lookback period constitutes a full and complete release of any and all Customer responsibility for the charges.

    **B2.1.4.**   **Billing Disputes**

        **B2.1.4.1.**   **Withholding Payment from an Invoice Containing Disputed Charges.** If Customer, in good faith, disputes the amount of any specific charge or charges contained within an invoice (collectively per invoice the "Charge"), then Customer may withhold the amount of the disputed Charge from payment of the invoice, as long as: i) the amount being withheld does not exceed 10% of the total due under the invoice containing the disputed Charge, and ii) Customer provides documentation reasonably sufficient to resolve the dispute (the "Billing Dispute") by or before the Due Date, and iii) Customer pays all undisputed amounts by the Due Date. Such documentation must include, but is not limited to, i) copies of any disputed CDRs in a legible format if part of the disputed service, and ii) a written explanation as to the nature and exact reason for the dispute, and iii) copies of calculations used to derive the disputed amount, and iv) a point of contact with whom Vendor should work with to resolve the Billing Dispute (collectively the above are referred to the "Dispute Documentation").

        **B2.1.4.2.**   **Disputing Charges from a Previously Paid Invoice.** If Customer pays an invoice in full and Customer wishes to then (post payment of the full invoice) dispute a Charge on the paid invoice, Customer must submit the Dispute Documentation within ten (10) days of the Due Date of the Invoice containing the disputed Charge. Upon submitting proper Dispute Documentation within the above specific timeframe, Customer may then withhold the amount of the disputed Charge from payment of a current invoice, as long as the amount being withheld does not exceed 10% of the total due under the invoice that contained the disputed Charge for which Customer is withholding. All other undisputed amounts of all invoices must be paid in accordance with this Agreement.

        **B2.1.4.3.**   **Billing Dispute Resolution.** Vendor shall have sixty (60) days after its receipt of a Billing Dispute that is submitted properly in accordance with this Agreement to make a determination as to the validity of the Billing Dispute. Both Parties agree to work together in good faith during this sixty (60) day period to resolve the dispute. The final determination of the dispute shall be provided to Customer in writing by Vendor and must be signed by an officer of Vendor. Only this written determination shall be binding upon Vendor. Oral communications and/or discussions regarding the dispute shall not be binding upon Vendor. If the Parties cannot mutually resolve the Billing Dispute within sixty (60) days of Vendor' receipt of the Billing Dispute, then either Party may thereafter obtain dispute resolution pursuant to 12.4 of this Agreement. If Customer's dispute is determined by Vendor, in its sole discretion, to be invalid then any amounts withheld shall be subject to a Late Fee calculated from the date the withheld funds were originally Due to the date the withheld funds are paid and Customer must pay all amounts withheld plus the Late Fee via wire transfer within three (3) business days of the notice regarding the outcome of the dispute being sent by Vendor to Customer.

        **B2.1.4.4.**   **Failure to Dispute.** Failure to dispute a Charge in accordance with B2.1.2.1 or B2.2.2 will create an irrefutable presumption of the correctness of the Charge and Customer shall have waived its right to dispute the Charge. Should Customer withhold payment of any portion of any invoice based on a claim that it is disputing a Charge and Customer fails to adhere to the terms of this Agreement with respect to Billing Disputes, then Customer shall be deemed to have committed a Payment Default. Any claim of fraudulent usage shall not constitute valid justification for a billing dispute of

DocuS  Envelope ID: 52F24742-490A-49F8-95A4-DF5DD7BC0192

an invoice. Customer is solely responsible for paying for all its Service usage, allegedly fraudulent or otherwise, and for all other charges, which may be associated with such usage.

**B2.1.4.5.** **Issuing Credits.** Should Vendor determine that Customer is entitled to a Credit, whether as a result of a Billing Dispute or for any other reason, Vendor will notify Customer of such in writing, and such notice must be signed by an officer of Vendor. No oral promises or discussions shall be binding upon Vendor with regards to Credits to be issued to Customer.

**B2.2.** **U.S. Funds.** All billing and other transactions will be paid in U.S. Dollars using the payment methods identified on the Vendor Invoice.

**B2.3.** **Payment Method.** Customer agrees to pay Vendor's recurring and non-recurring charges for the Services by electronic transfer in U.S. Dollars, in accordance with the agreed upon Billing and Payment Terms found within Attachment B. Payment wiring instructions are found in Attachment C.

**B2.4.** **Payment Date.** The Payment Date, for purposes of determining whether a payment was made by the Due Date or was "Late", shall be the date that immediately available funds are credited to Vendor's account on behalf of Customer.

**B2.5.** **Late Fees.** In addition to its rights listed in this Agreement, Vendor may assess a fee to Customer for any unpaid amounts owed that have not been paid by the Due Date for such charges. In the event that Vendor does not receive full payment by the Due Date, Customer shall also pay Vendor interest upon the unpaid balance of any charges calculated from and after the applicable Due Date in an amount equal to the lesser of: (i) one percent (1.0%) per month. Should Customer withhold funds as a Billing Dispute, and such dispute becomes the subject of arbitration or litigation, and Vendor prevails in such arbitration or litigation, then Customer agrees to pay all Late Fees associated with the withheld funds with the Late Fees being assessed from the date of the Due Date of the invoice or invoices which the funds were withheld on through the payment date of all funds due to Vendor.

**B2.6.** **Billing Adjustment.** Vendor may make billing adjustments for Vendor Services for a period of thirty days after the initial and valid invoice for a Service is rendered.

**B3 RATE CHANGES.** During the term of this Agreement, Vendor shall charge for the Service, and Customer shall pay for the Service, under the terms and rates listed within this Agreement. Both parties must agree in writing to accept any future rate changes or rate modifications of any kind during the Term. The rates and charges do not include Taxes; install charges, Federal or any other surcharges, CPE or any other incidental or other charges, which are the responsibility of Customer. In order for a rate change to be valid and binding, it must be signed by both an officer of Customer and an officer of Vendor and must include, the current rate(s), the future rate(s) and the future rate effective date(s).

### ATTACHMENT C
### BANK WIRE EFT RECIPIENT INFORMATION

**Beneficiary:**       Exiant Communications LLC

**Address:**           1213-J Liberty Rd #216 Eldersburg, MD 21784

**Phone:**             410-826-5551
**Fax:**               443-276-6714

**Bank:**              Bank of America 6400 Ridge Rd, Eldersburg, MD 21784

**ACH Routing / ABA:**   **052001633** (paper & electronic)
**Wire Routing / ABA:**  **026009593** (wires)

Page 11 of 12

DocuSign Envelope ID: 37501275-C79D-4031-B061-D0298DDD010B

Confidential & Proprietary                                    NLA Master Services Agreement

Checking Account #:    **446039627717**


**For International Wires Please Use the Following:**

**SWIFT Code: BOFAUS6S**

**Please include company name and account number on all wire references**

**Please note that Exiant only accepts electronic forms of payment**


Page 12 of 12

**EXHIBIT B**

DocuSign Envelope ID: 4E220814-8E31-437F-AD3A-96C26C0A46F0

Confidential & Proprietary                                    Master Services Agreement

# EXIANT MASTER SERVICES AGREEMENT

## I. CUSTOMER INFORMATION SECTION

Customer Legal Name: HFA Services LLC dba Call 48 and its affiliates
Customer State of Incorporation: <u>Florida</u>
Customer Address1: _____
Customer Address2: _____
Customer City/State/Zip code: _____ / _____ / _____
Phone:_____                              Fax: _____

## II. CUSTOMER NOTICES SECTION

For Customer:

| Billing Address Information: | Contract & Rate Notices: |
|---|---|
| Contact Name: _____<br>Fax: _____<br>Email: _____<br><br>*Complete below if different from Customer*<br>*Address in Customer Information Section*<br>Address: _____<br>City/State/Zip:_____<br>Phone: _____ | Contact Name: _____<br>Fax: _____<br>Email: _____<br><br>*Complete below if different from Customer*<br>*Address in Customer Information Section*<br>Address: _____<br>City/State/Zip:_____<br>Phone: _____ |

**THIS MASTER SERVICES AGREEMENT** (the "Agreement") is entered into by and between Customer (as identified in the Customer Information Section and Exiant Communications, LLC. a Florida limited liability company with a mailing address of 1213-J Liberty Rd #216 Eldersburg, MD 21784 (hereinafter referred to as "Vendor"). Customer and Vendor are sometimes referred to collectively as the "Parties" or individually as a "Party."

In consideration of the following mutual promises and covenants, the Parties agree as follows:

1  **SERVICES**
   1.1. <u>Purchase</u>. Customer shall purchase from Vendor the Service described herein (the "Services") in accordance with the terms and conditions of this Agreement and its attachments, which are hereby made a part of this Agreement. Vendor, in its sole discretion, may provide the Services directly to Customer, or may cause such Services to be provided by third parties, including one or more Underlying Carriers ("ULCs") whom which Vendor has contracted for such purposes.
   1.2. <u>Services</u>. Customer is ordering the Services as described in Attachment A - Services.

2  **TERM AND TERMINATION**
   2.1. <u>Term.</u> This Agreement shall be effective as of the date both Parties have executed this Agreement (the "Effective Date"). The Term of this Agreement shall be for the period beginning on June 1, 2021 and ending August 31, 2021
   2.2. <u>Termination</u>.
      2.2.1. Payment Default. A "Payment Default" shall occur if Customer (a) fails to pay the Flat Fee referenced in Addendum B on or before June 2, 2021, or (b) fails to make full and timely payment of any other payment as required under this Agreement (except for billing disputes as described in Attachment B) and such failure arising under section 2.2.1(b) remains uncorrected for ninety (90) calendar days from the Due Date.  In the event of a Payment Default, Vendor may, without liability to Vendor, in addition to its rights available to it at law or in equity: (i) suspend any or all Services to Customer; (ii) cease accepting or processing orders for Services; and/or (iii) terminate this Agreement.  All unpaid charges for Services that remain outstanding beyond the Due Date will be subject to LateFees.
      2.2.2. Other Defaults and Remedies. An "Other Default" shall occur if Customer fails to perform or observe any material term or obligation, excluding payment terms, contained in this Agreement, and any such failure remains uncorrected for fifteen (15) calendar days after written Notice is received by Customer from Vendor.

Page 1 of 11

DocuSign Envelope ID: 4E220814-8E31-437F-AD3A-96C26C0A46F0

| Confidential & Proprietary | Master Services Agreement |
|---|---|

    2.2.2.1. Other Default by Customer. In the event of any Other Default by Customer, Vendor may, without liability to Vendor, and in addition to its rights available to it at law or in equity: (i) suspend any or all Services to Customer; and/or (ii) cease accepting or processing Service Orders for Services; and/or (iii) terminate this Agreement without any liability to Vendor.

    2.2.3 Customer Impact on Network. Notwithstanding anything to the contrary herein, if, in Vendor's reasonable judgmentCustomer, Customer's Affiliates or Customer's End User: i) violates this Agreement, and such violation or failure to comply poses an immediate threat of harm to or destruction of Vendor's network or Vendors ULC network, ii) violates existing law or regulation prohibiting fraud,then Vendor shall have the right to take any and all steps reasonably necessary to remove such threat or combat potential fraud, including but not limited to suspension or termination of Services. . immediately and without notice, allwithout any liability to Vendor

## 3   PAYMENT

    3.1. Payment Terms. Customer specific payment terms are found in Attachment B to this Agreement.

## 4   EQUIPMENT AND TESTING.

**EQUIPMENT AND TESTING.** Each Party will purchase, install, license (if required), test and operate all equipment for its network necessary to fulfill its obligations under this Agreement. Testing of new hardware and/or software is required to provide interoperability between Vendor and Customer as mutually agreed to by the Parties. In cases where Vendor is utilizing a third party to provide some or all of the Services, Customer may be required to work directly with the third party on provisioning and testing of those third-party Services.

## 5   OWNERSHIP.

**OWNERSHIP.** All computer programs, software, drawings, diagrams, specifications, Confidential information and other information and materials, and all intellectual property therein or based thereon, now owned by or developed by or for Vendor, or which may be licensed or sublicensed by Vendor, or which may be owned by or developed by or for Vendor, in connection with delivering the Services to Customer as a result of or related to this Agreement, whether or not developed at the specific request of Customer, shall remain the sole and exclusive property of Vendor and Customer acquires no rights or licenses, express or implied, in same by virtue of this Agreement or the provision of the Services or other services hereunder, unless otherwise expressly set forth in a separate written agreement between Vendor and Customer.

## 6   SURVIVAL PROVISIONS.

**SURVIVAL PROVISIONS.** The provisions for Ownership, Limitation of Liability and Indemnification and Confidential Information shall survive the expiration or the termination of this Agreement.

## 7   CONFIDENTIAL INFORMATION.

**CONFIDENTIAL INFORMATION.** For purposes of this Agreement, the Party disclosing Confidential Information is the "Discloser", and the Party receiving Confidential Information is the "Recipient." Confidential Information means all information concerning the Parties' business including, but not limited to, all tangible, intangible, visual, electronic, present, or future information such as: (a) trade secrets; (b) financial information, including pricing; (c) account contact information; (d) vendor contact information; (e) business information, including operations, planning, marketing interests, and products; (f) the terms of any agreement between the Parties and the discussions, negotiations and proposals related to that agreement; and (g) any proprietary methodology utilized by either of the parties in the deliveryof the Services. Confidential Information disclosed to the other Party must be clearly identified as Confidential Information at the time of disclosure.

    7.1. Confidential Information is to be used by the Recipient only for the purposes contemplated by this Agreement, and the Recipient may not disclose the same to anyone other than the Recipient's employees, accountants, attorneys, consultants, or other representatives on a need-to-know basis and who agree to be bound by the terms of this Section or to law enforcement acting in accordance with its lawful authority. Proprietary Information may not be retained by the Recipient and all originals and any copies or summaries shall be returned to the Discloser no later than upon termination of this Agreement.

    7.2. Neither Party may use the name, logo, trade name, brand name, service marks, trademarks, copyright, patent, business process, printed materials, or any other intellectual property of the other Party or its respective affiliates, in any promotional or advertising material, statement, document, press release, broadcast, provisioning of services, or otherwise without the prior written consent of the other Party, which consent may be granted or withheld at the other Party's sole discretion. Each Party's name and the names of its Affiliates are proprietary and nothing herein constitutes a license authorizing their use, and in no event shall Customer attempt to sell service to its End Users using the name of Vendor or its Affiliates. In addition, Customer shall not state to End Users or prospective End Users: (i) that they will be Vendor Customers or that they may obtain Vendor service from Customer; or (ii) that Customer has any relationship with Vendor other than an Agreement to purchase Services on a wholesale basis.

## 8   LIMITATION OF LIABILITY; DISCLAIMER OF WARRANTIES

WITHOUT LIMITING CUSTOMER'S OBLIGATION TO PAY FOR SERVICES AND ANY OTHER EXPRESS FINANCIAL OR LIABILITY PROVISIONS PROVIDED FOR IN THIS AGREEMENT, VENDOR SHALL NOT BE LIABLE TO THE CUSTOMER FOR ANY INDIRECT, CONSEQUENTIAL, EXEMPLARY, SPECIAL, RELIANCE, INCIDENTAL OR PUNITIVE DAMAGES (INCLUDING WITHOUT LIMITATION, LOST BUSINESS, REVENUE, PROFITS, OR GOODWILL) ARISING OUT OF OR RELATED TO THE PERFORMANCE OR NONPERFORMANCE OF THIS AGREEMENT, OR THE PROVISIONING OF SERVICES HEREUNDER (INCLUDING ANY SERVICE IMPLEMENTATION DELAYS/FAILURES), UNDER ANY THEORY OF TORT, CONTRACT, WARRANTY, STRICT LIABILITY OR NEGLIGENCE, EVEN IF THE VENDOR HAS BEEN ADVISED, KNEW OR SHOULD HAVE KNOWN OF THE POSSIBILITY OF SUCH DAMAGES. VENDOR MAKES NO WARRANTIES, EXPRESS OR IMPLIED, AS TO ANY SERVICE PROVISIONED HEREUNDER. VENDOR SPECIFICALLY DISCLAIMS ANY AND ALL IMPLIED WARRANTIES; INCLUDING WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR TITLE OR NON-INFRINGEMENT OF THIRD-PARTY RIGHTS. IF CUSTOMER NOTIFIES COMPANY IN WRITING OF ANY MATERIAL BREACH OF THIS AGREEMENT WITHIN THIRTY (30) DAYS OF SUCH ALLEGED MATERIAL BREACH (WHICH SUCH NOTICE SHALL DESCRIBE IN REASONABLE DETAIL), COMPANY MAY AT ITS OPTION RE-PERFORM THE SERVICES AT ISSUE WITH SUCH RE-PERFORMANCE CONSTITUTING THE SOLE REMEDY OF CUSTOMER FOR SUCH BREACH. NOTWITHSTANDING THE FOREGOING, VENDOR'S TOTAL LIABILITY HEREUNDER SHALL IN NO EVENT EXCEED AN AMOUNT EQUAL TO THE CHARGES APPLICABLE UNDER THIS AGREEMENT OR THE APPLICABLE SERVICE ORDER FOR THE PERIOD DURING WHICH THE SERVICES WERE AFFECTED FOR THOSE SERVICES WITH MONTHLY RECURRING CHARGES, VENDOR'S LIABILITY IS LIMITED TO AN AMOUNT EQUAL TO THE PROPORTIONATE MONTHLY RECURRING CHARGES FOR THE PERIOD DURING WHICH SERVICE WAS AFFECTED. THE FOREGOING LIMITATION APPLIES TO ALL CAUSES OF ACTIONS AND CLAIMS, INCLUDING WITHOUT LIMITATION, BREACH OF CONTRACT, BREACH OF WARRANTY, NEGLIGENCE, STRICT LIABILITY, MISREPRESENTATION AND OTHER TORTS. Customer acknowledges and accepts the reasonableness of the foregoing disclaimer and limitations of liability. No cause of action under any theory which occurred more than one (1) year prior to the institution of a legal proceeding alleging such cause of action may be asserted by either Party against the other, and shall be barred by this agreed limitation.

## 9   REGULATORY COMPLIANCE AND INDEMNIFICATION

9.1. This Agreement is made expressly subject to all present and future valid orders and regulations of any authority having jurisdiction of the subject matter hereof, and to the laws of the United States, or any of its States, or any foreign governmental agency having jurisdiction.

   9.1.1. In the event this Agreement, or any of its provisions, shall be found contrary to, or in conflict with, any such order, rule, regulation, or law, this Agreement shall be deemed modified to the extent necessary to comply with any such order, rule, regulation, or law and shall be modified in such a way as is consistent with the form, intent, and purpose of this Agreement.

   9.1.2. If the Federal Communications Commission, a state Public Utilities Commission or a court of competent jurisdiction issues a rule, regulation, law, or order after the date of this Agreement which has the effect of canceling, changing, or suspending any material term or provision of this Agreement of any of the Service Orders (collectively, "Regulatory Requirement"), then this Agreement shall be deemed modified in such a way as the Parties mutually agree is consistent with the form, intent and purpose of this Agreement, to the extent necessary to comply with such Regulatory Requirement. Should the Parties not be able to agree on the modifications necessary to comply with a Regulatory Requirement within fifteen (15) days after the Regulatory Requirement is effective, the Parties shall submit the matter to arbitration in accordance with paragraph 12.4 of this Agreement.

   9.1.3. If reporting obligations or requirements are imposed upon Vendor by any regulatory or governmental third party or regulatory agency in connection with either this Agreement or the Services, including use of the Services by Customer or its End Users, Customer agrees to assist Vendor in complying with such obligations and requirements, as reasonably required by Vendor.

   9.1.4. The Parties acknowledge and agree that both (i) certain equipment, software and technical data which may be provided or utilized in connection with the furnishing of the Services hereunder; and (ii) the use of such services may be subject to export, re-export or import controls under the United States Export Administration Regulations or similar regulations of the United States or of any other country.

9.2. Basic 911 and E911 Service Limitation. Customer understands and agrees that the Service cannot complete calls to

DocuSign Envelope ID: 4E220814-8E31-437F-AD3A-96C26C0A46F0

Basic 911, E911 or other emergency calling services and that Customer will not utilize the Service in the provision of any offering to its end users that would require the Service to provide Basic 911 or E911 functionality. Customer agrees that it shall be solely liable for and shall indemnify Vendor from and against any and all lawsuits, claims, demands, penalties, losses, fines, liability, damages and expenses, including reasonable attorney's fees, arising out of or in any way relating to such inability to complete Basic 911, E911, and other emergency calls, including, without limitation, any actual failure of any such call to be completed.

9.3. Customer knowingly and expressly indemnifies and holds harmless Vendor from and against any loss, cost, claim, liability, damage or expense (including reasonable attorneys' fees) to third parties, relating to any claim or allegation that any access charges or other inter-carrier compensation-related payments are owed as a result of Customer's performance of this Agreement. Customer acknowledges and agrees that Vendor services are only delivered via IP protocol directly, and the handoff to the Customer occurs from the Ethernet port of Vendor's network equipment.

## 10  TAXATION

Customer shall be responsible for all Taxes that arise in any jurisdiction, including sales taxes, Universal Service Fees, use, consumption, and other taxes (excluding Taxes on Vendor' income) as well as any fees, surcharges or other charges that are attributable to Customer. Should any taxes, surcharges, charges or fees be passed onto/charged to Vendor that are attributable to Customers use of the Service, Vendor shall pass these onto the Customer without markup and Customer shall pay these amounts to Vendor. Should Customer claim an exemption of any value-added, sales, use, or other tax, Customer will provide officially documented/certified proof of such exemption to Vendor. It is Customer's responsibility to ensure its exempt status, and the proof thereof, remains current. In no event will Vendor be liable for any taxes due by Customer and Customer will indemnify Vendor if any such claim for taxes is made.  Vendor will invoice Customer for taxes and other charges, if any, that are not covered by a valid tax exemption certificate properly filed with Vendor and Customer shall pay such invoice, without set-off or dispute, within ten (10) days of the date of the invoice. Customer represents and warrants that it has obtained and shall maintain all approvals, consents, governmental authorizations, licenses and permits as may be required to utilize the Services purchased from Vendor under this Agreement. Customer will be responsible for paying all appropriate taxes, penalties and interest that may be assessed by any tax authority and that it shall fully and completely indemnify, defend, and hold harmless Vendor, with respect to such issue and further, including reimbursing Vendor for any all costs expended by Vendor should Vendor be required to defend itself, with regards to Customer's tax exemption claim.

## 11  CUSTOMER RESALE AND END USER RESPONSIBILITIES

11.1. Customer is solely responsible for obtaining all licenses, approvals, and regulatory authority for its use and operation of the Services and the provision of Services to its End Users. In connection with its resale of the Services, Customer is solely responsible for all Customer service, and other service-related requirements of its End Users, and Vendor shall have no liability to Customer's End Users under this Agreement.  Customer's payment obligations hereunder are not contingent upon Customer's ability to collect payments or charges from its End Users, Affiliates, agents, brokers or re-sellers.

11.2. Vendor may suspend any or all of the Services and/or terminate this Agreement without any liability to Vendor, if Vendor in good faith determines (a) that Customer has failed to comply with any applicable foreign, federal, state or local law or regulation applicable to Customer's resale of the Services or use by Customer's End Users; or (b) Regulatory Activity prohibits, restricts or otherwise prevents Vendor from furnishing such Service. Customer shall save, protect, indemnify and hold Vendor harmless from and against any and all claims, demands, suits, actions, losses, damages, assessments or liabilities of any nature whatsoever arising directly or indirectly out of: (a) any damages caused by intentional or illegal acts of Customer or any of its End Users, in connection with its use of or resale of the Services; (b) Customer's or End User's use, resale or modification of the Services, or (c) any claims by Customer's Customers or ultimate End Users alleging any defect in any of the Services.

11.3. The terms, representations, warranties and agreements of the Parties set forth in this Agreement are not intended for, nor shall they be for the benefit of or enforceable by, any third party (including, without limitation, Customer's Affiliates and End Users).

## 12  MISCELLANEOUS

12.1. Notices. Except as otherwise provided in this Agreement, all non-Rate change required or permitted notices shall be in writing and shall be deemed to be effective upon dispatch if sent by (i) overnight courier or hand delivery, (ii) facsimile, with confirmation by letter, or (iii) electronic (email) transmission. (Rate Notifications are addressed in

Page 4 of 11

Docu$. 🔲 Envelope ID: 4E220814-8E31-437F-AD3A-96C26C0A46F0

Confidential & Proprietary                                                    Master Services Agreement

Attachment B). Notice by electronic mail shall be deemed given when the sending Party receives validation from the receiving Party's e-mail server. Either Party may change its Notice information by giving prior written notice according to the terms herein. Notices to Vendor may be delivered to the below. Notices to Customer will be delivered in accordance with the information in Section II Customer Notices Section of this Agreement.

All Notices for Vendor:
Exiant Communications  Attn: Legal Department
1213-J Liberty Rd #216 Eldersburg, MD 21784
Email: legal@exiantcom.com

12.2. Waiver. No term or provision of this Agreement shall be deemed waived and no breach or default shall be deemed excused unless such waiver or consent shall be in writing and signed by the Party claimed to have waived or consented. No consent by any Party to, or waiver of, a breach or default by the other Party, whether express or implied, shall constitute consent to, waiver of, or excuse for any different or subsequent breach or default or shall be construed as a continuing waiver of such right or a waiver of any other provision hereunder.

12.3. Force Majeure. For purposes of this Agreement, "Force Majeure" means any event or circumstance beyond the reasonable control of Vendor which affects the performance by Vendor of its obligations hereunder, including but not limited to, any war, declared or not, or hostilities, or belligerence, blockade, revolution, insurrection, acts of terror, riot, public disorder, expropriation, requisition, pandemic, confiscation or nationalization, whether imposed by law, decree or regulation by any governmental authority, or fire, unusual flood, earthquake, volcanic activity, storm, typhoons, lightning, unforeseen changes to Vendor's ULC contracts, performance of Vendor's ULCs, or any event, matter or thing, wherever occurring that is clearly outside of Vendors reasonable control. In the event of a Force Majeure Event, Vendor shall not be liable to the other for any delay or failure in performance of any part of this Agreement, and the time for performance of such obligation shall be excused for the period of such delay or prevention and extended for a period equal to the period of such delay or prevention. The Party claiming relief under this Section shall notify the other in writing of the existence of the Force Majeure Event. Notwithstanding this provision, Customer shall in no way be relieved of any of its payment obligations as provided herein.

12.4. Choice of Law. This Agreement will be governed by and construed in accordance with the Laws of the State of Florida, USA, without regard to conflicts of law principles.

12.5. Litigation; Waiver of Jury Trial; Arbitration; Forum Selection. Any issue, claim, or dispute arising out of or relating to this Agreement, including but not limited to the breach, termination, enforcement, interpretation or validity of this Agreement, billing, rate or payment dispute or a tort claim or action, shall be determined as follows. THE PARTIES WILLINGLY, VOLUNTARILY AND KNOWINGLY WAIVE TRIAL BY JURY IN ANY SUCH ACTION, PROCEEDING, ISSUE CLAIM OR DISPUTE RELATED TO OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS BETWEEN THE PARTIES, INCLUDING BUT NOT LIMITIED TO ANY TORT CLAIMS BETWEEN THE PARTIES. If the amount in controversy or damages claimed is $30,000 or less (exclusive of interest, costs and attorneys' fees), then the District Court for Orange County shall have the sole and exclusive jurisdiction and venue. The prevailing party shall be entitled to reimbursement from the other party for its share of the fees and costs of the litigation and for all other costs of the litigation, including but not limited to reasonable attorneys' fees and costs. If the amount in controversy or damages claimed exceeds the sum of $30,000 (exclusive of interest, costs, and attorneys' fees), then all claims, issues, or disputes shall be determined by binding arbitration before a single arbitrator to be administered by the Judicial Arbitration and Mediation Service ("JAMS") pursuant to its Comprehensive Arbitration Rules and Procedures, and such arbitration shall be held in Orange County, Florida. If, at the time the arbitration is to be commenced, JAMS does not have a Florida office or if JAMS no longer exists or does not accept the case for arbitration, then arbitration shall be administered by the American Arbitration Association ("AAA"), in Florida, pursuant to its Comprehensive Arbitration Rules for Complex Commercial Disputes. Any award entered by the arbitrator may beconfirmed and entered as a judgment by any court having jurisdiction. This clause shall not preclude the parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction or from seeking anyequitable remedy that is not within the jurisdiction of the District Court of Florida or can be awarded by an arbitrator, such as injunctive relief or declaratory judgment. With regard to any arbitration between the parties, each Party will be responsible for paying its own share of the fees and costs during the arbitration, including but not limited to filing fees and the hourly fees of the arbitrator. The prevailing party shall be entitled to reimbursementfrom the other party for its share of the fees and costs of the arbitration and for all other costs of the arbitration, including but not limited to reasonable attorneys' fees and costs. The arbitrator is authorized to include such fees and costs in any award. With regard to any litigation between the parties, the prevailing party shall be entitled to collect from the other party all costs of litigation, including but not limited to any and all expenses incurred and all reasonably documented attorneys' fees and costs. It is the express intent and agreement of the parties that this provision shall not be

, DocuSign Envelope ID: 4E220814-8E31-437F-AD3A-96C26C0A46F0

extinguished by or merged into any award, order, decree or judgment, but shall survive such award, order, decree, or judgment.

12.6. Headings: Section References. The headings and other captions in this Agreement are for convenience and reference only and shall not be used in interpreting, construing or enforcing any of the provisions of this Agreement. All references to Sections in this Agreement are to sections of this Agreement.

12.7. No Partnership. Nothing contained in this Agreement shall be construed to create a partnership or joint venture between the Parties or their successors in interest or permitted assigns. The relationship between the Parties is that of independent contractors and shall not be that of partners, and nothing herein shall be deemed to constitute a partnership, agency, joint venture, employee relationship or franchise between them or a merger of their assets or their fiscal or other liabilities or undertakings. Neither Party shall have the right to bind the other Party, or otherwise or make any representations or guarantees on behalf of the other, except as expressly provided for in this Agreement.

12.8. Counterparts. This Agreement may be executed in any number of counterparts and any Party hereto may execute any such counterpart, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument. This Agreement shall become binding when one or more counterparts taken together shall have been executed and delivered (which deliveries may be by facsimile or email) by the Parties.

12.9. Amendment: Waiver. This Agreement may be amended by the Parties only by execution of an instrument in writing signed on behalf of each of the Parties hereto. Any extension or waiver by any Party of any provision hereto shall be valid only if set forth in an instrument in writing signed on behalf of such Party. No waiver of any breach of any agreement or provision contained herein shall be deemed a waiver of any preceding or succeeding breach of any other agreement or provision herein contained. No extension of time for the performance of any obligation or act shall be deemed an extension of time for the performance of any other obligation or act.

12.10.        Release and Covenant Not to Sue. Customer hereby irrevocably and unconditionally (a) releases, discharges, remises, and acquits the Vendor and its affiliates, and their respective employees, members, officers, directors, contractors, agents and representatives (the "Released Parties") of and from any and all known or unknown manner of complaints, demands, actions, suits, liabilities, causes of action, disputes, costs, damages and claims of every kind, nature and description upon or by reason of any matter arising at any time prior to the date of this Agreement including, but not limited to, any claims arising out of or related to any prior agreements by and between Vendor and Customer or Customer's affiliates including but not limited to HFA Holdings LLC (collectively, the "Claims");  and (b) covenants not to sue any of the Released Parties for any Claims arising prior to the date of this Agreement.

12.11.         Business Days. If any date herein set forth for the performance of any obligations by any Party or for the delivery of any instrument or notice as herein provided should fall on a Saturday, Sunday or Legal Holiday (hereinafter defined), the compliance with such obligations or delivery shall be deemed acceptable on the next business day following such Saturday, Sunday or Legal Holiday. As used herein, the term "Legal Holiday" shall mean any day on which banking institutions are required to close in the State of Maryland. As used herein, the term "Business Day" means any day other than a Saturday, Sunday or Legal Holiday.

12.12.        Binding Effect. If any provision of this Agreement is held to be invalid or unenforceable, the remainder of the Agreement will remain in full force and effect, and such provision will be deemed to be amended to the minimum extent necessary to render it enforceable.

12.13.        Assignment. Customer shall not assign, sell or transfer this Agreement or any of its rights or obligations hereunder, including the right to receive the Services, whether by operation of law or otherwise, without the prior written consent of Vendor. Any attempted Customer assignment in violation hereof shall be null and void and shall be deemed a material breach of this Agreement. This Agreement shall inure to the benefit of and be binding upon the Parties hereto and their respective affiliates, successors and assigns

12.14.        Authority. The Parties represent and warrant that: (i) the full legal name of the legal entity in this Agreement is accurately set forth herein; (ii) the person signing this Agreement has been duly authorized to execute this Agreement on the Party's behalf; and (iii) the execution hereof is not in conflict with law, the terms of any charter, bylaw, articles of association, or any agreement to which the Party is bound or affected. Vendor may act in reliance upon any instruction, instrument, or signature reasonably believed by Vendor to be genuine. Vendor may assume that any employee of Customer who gives any written notice, Order Form, or other instruction in connection with this Agreement has the authority to do so.

12.15.        Entire Agreement. This Agreement, together with the Schedules and Exhibits attached hereto, all of which are incorporated by reference, sets forth the entire understanding of the Parties hereto with respect to the entire business relationship between Customer and any/all of its affiliates, and Vendor. The Parties also agree that this Agreement is the sole agreement between the Parties and any and all previous agreements and understandings between or among the Parties regardless of the subject matter, whether written or oral, are superseded, replaced, released and voided in their entirety by this Agreement, and the Parties hereby represent to one another that there

Docusign Envelope ID: 4E220814-8E31-437F-AD3A-96C26C0A46F0

Confidential & Proprietary                                            Master Services Agreement

are no other agreements, understandings or representations between them that are not set forth within this Agreement.

12.16.     **Proper Execution.** The submission by Vendor to Customer of this Agreement in an unsigned form shall be deemed to be a submission solely for Customer's consideration and not for acceptance and execution. Such submission shall have no binding force or effect, shall not constitute an option or an offer and shall not confer any rights, irrespective of any reliance thereon, change of position or partial performance. The submission of this Agreement for execution by Customer and the actual execution thereof by Customer and delivery to Vendor by Customer shall similarly have no binding force and effect on Vendor unless and until Vendor shall have executed this Agreement and a counterpart hereof executed by both Vendor and Customer.

12.17.     **Mutual Drafting.** This Agreement is the mutual product of the Parties hereto and each provision hereof has been subject to the mutual consultation, negotiation and agreement of each of the Parties and shall not be construed for or against any Party hereto.

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be duly executed effective as of the day and year last written below.

Exiant Communications LLC.                              HFA Services, LLC

By: *Jim Finneran*                                       By: _____
    858437CA7...(signature)                                  02C6B1ABE6CB...(signature)

Name:  James Finneran                                    Name:  Michael Halperin

Title: CEO                                               Title:  Ceo
Date: May 31, 2021                                       Date:  May 31, 2021

Page 7 of 11

ATT A - 39

DocuSign Envelope ID: 4E220814-8E31-437F-AD3A-96C26C0A46F0

Confidential & Proprietary                                          Master Services Agreement

## ATTACHMENT A
### SERVICES

Introductory Note: Any term defined in this Attachment and not also located within the Agreement and/or its other supporting attachments is provided for convenience only and shall not alter or define any other term within the Agreement or its other supporting attachments.

- Billing Increments – are six seconds; Vendor bills 6/6 for inbound national local access.
- CDR – means Call Data Records
- Channel or "VoIP port" – The capacity to operate one VoIP call at one time.
- DID - Direct Inward Dial number, otherwise known as a local telephone number ("TN") NPA-NXX-XXXX
- DL - Directory Listing
- Donating Carrier – the carrier from whom a number is being ported
- ICB – Individual Case Basis
- LERG - Telcordia LERG Routing Guide
- LNP – Local Number Portability. Defined by the Federal Communications Commission (FCC). The FCC regulates the porting process of DIDs between carriers. Vendor porting process are provided by its ULCs.
- MOU – means Minutes of Use as defined by the Billing Increments
- MRC - means Monthly Recurring Charge.
- NRC - means Non-Recurring Charge.
- Rate Center – As defined in the LERG. The specific geographic point and corresponding geographic area which are associated with one or more particular NPA/NXX codes that have been assigned to a local exchange carrier for its provision of exchange services. Examples: AL ABBEVILLE
- RPM – means Rate Per Minute
- TN – Telephone Number aka DID
- ULC – Underlying Carrier
- Vendor Network - means the network either owned by Vendor or those of the third party ULCs that Vendor utilizes to supply the Service to Customer.

A1.0 **National Local Access (NLA) Service:** Provides packetized interconnection for the delivery of local traffic to Customer. The NLA Service is intended for voice traffic transmission only. Under this Service, Customer and Vendor will interconnect their respective IP networks and Vendor will deliver such local traffic to Customer as IP packets utilizing SIP signaling. Customer acknowledges and agrees that Customer is accepting the IP handoff directly from the Vendor session border controller located in the Vendor facility. Any protocol other than SIP, and/or any other codec other than G.711 and G.729 will be addressed as a separate amendment to this agreement. Customer is responsible for termination of the traffic to Customer's end-users. The Service also includes the following:

    A1.1 **Port-In:** Customer may not Port in any additional TNs excepting in the case of a Snapback of a TN that needs to be returned to Vendor, whether on behalf of Customer or other customers.

    A1.2 **Customer Requests to Port-Out:** Customer acknowledges and agrees that Vendor may receive requests by Customer on behalf of Customer's customer, with the appropriate approval by Customer's customer to porta TN to a either a third-party provider or to another provider of Customer (Port-Out). Vendor will support all such properly submitted requests and will cooperate with the Port-Out in accordance with Vendor's standard operating policies and practices. Porting by Customer of TNs pursuant to this section shall in no way relieve Customer of any of its obligations under this contract. Customer TNs not Ported Out shall be reclaimed by Vendor on the date of Termination of this Agreement.

    A1.3 **Third-Party Carrier Requests to Port-Out:** Port-Out Requests submitted to Vendor by other Carriers will be processed by in accordance with Vendor's standard operating policies and practices and in compliance with applicable laws and regulations. Vendor will assist, if requested, in good faith, in ensuring that the port requests are properly submitted to HFA's carrier so that Vendor can then successfully process the port requests. Vendor will process properly submitted requests in good faith and in a commercially reasonably expeditious time frame. Vendor and/or its third party vendors will agree to work directly with D&D Advisors (D&D) to facilitate and process port-out requests, which will include working with D&D to ensure all port-out information is correct. Vendor will provide Customer Service Records (CSRs) in a reasonable time frame to D&D for complex ports requests if required. For all Port Requests that Vendor approves prior to their submission, those port requests, once received by Vendor, will be processed by Vendor within 3 business days.

DocuSign Envelope ID: 4E220814-8E31-437F-AD3A-96C26C0A46F0

Confidential & Proprietary                                                    Master Services Agreement

## **ATTACHMENT B**

## **PAYMENT**

**B1** **Fees.**

    **B1.1.**          Customer agrees to the payment of a non-refundable, flat rate fee of $163,000 (the "Agreed Fee") for the term of the Service including the transfer of the NXB-D Blocks that are described within this Agreement. Customer must pay to Vendor, and Vendor must receive payment by close of business on June 2, 2021.

    **B1.2.**          If payment of the Initial Payment is not received by the Vendor in accordance with the wire transfer instructions in Attachment C by the Initial Payment Due Date, (1) the Vendor may immediately terminate this Agreement and any and all Services to Customer, without notice to Customer and without any liability to Vendor and (2) notwithstanding the termination of the Agreement and any Services hereunder, the entire Agreed Fee shall accelerate and be immediately due and payable without demand.

    **B1.3.**          In the event any of the Agreed Fee is not paid when due, interest shall accrue on unpaid amounts at the lesser of Eighteen Percent (18%) per annum or the highest rate allowed by Florida law until paid, Customer shall also pay and reimburse Vendor for its actual attorney's fees incurred in connection with the enforcement of this Agreement and the collection of any unpaid amounts.

**B2** **Payment Method.** Customer agrees to pay Vendor's recurring and non-recurring charges for the Services in U.S. Dollars and in accordance with the instructions are below in Attachment C.

DocuSign Envelope ID: 4E220814-8E31-437F-AD3A-98C26C0A46F0

Confidential & Proprietary         Master Services Agreement

## ATTACHMENT C
## BANK WIRE EFT INFORMATION

| | |
|---|---|
| **BANK NAME:** | Bank of America |
| **ADDRESS:** | 201 North Charles Street<br>Baltimore, MD  21201 |
| **PHONE:** | (410) 385-8310 |
| **VERIFICATION:** | (800) 577-9473 |
| **ROUTING NO.**<br>**Or ABA NO.** | 026009593 |
| **ACCOUNT** | SellmanHoff – Attorney Escrow Account<br>Acct. # 003928961545 |